...in which we'll hear our argument this morning is number 05-1531, Amado v. Microsoft Corporation. Let's see. Mr. McAuliffe? Am I pronouncing it correctly? Perfectly. Okay. Sometimes that doesn't happen. Most of the time it doesn't happen. Let's see. You've reserved four minutes for rebuttal, correct? That's right, Your Honor. Okay. Before you begin, I'll just note there are a number of issues here. I would just, you obviously handled the argument whichever way you want, but focus on the ones that, from your client's standpoint, you think are the most important.  And just start whenever you're ready. Thank you very much, Your Honor. Good morning. We are here today because the District Court erroneously interpreted the in-execution claim language. Based on that interpretation, enjoined the sale of Microsoft Office because of functionality in Office that no one has ever used. It then compounded that error by entering an escrow order of $2 a unit, even though the jury and the District Court itself had found that that was not the proper valuation of the invention. Well, I'm confused about the $2 a unit point. As I understand it, it's just an escrow account. He hasn't said what the disposition of that escrow account is going to be. As I understand the order, it's specifically reserved to the future. Now, as far as any prejudice about having to deposit the money in the escrow account, you know, that's pretty much over and done with. But are you complaining about the ultimate disposition of the escrow account? And if so, how can we address that when we don't know what the District Court is going to do about that? Well, first of all, it's not over and done with. The jury verdict here was for $6 million. The escrow account presently stands at about $66 million. And every month, about $8 or $9 million extra is required to be put into that account. So it is quite a burden, quite a large amount of money to put in there. But if we affirm, that stops, right? I mean, then the injunction comes into play, and then there's no more escrow account, right? That's true. But the escrow account itself and the way the Court did it suggested that the Court was going to award $2 a unit to Amato for the post-verdict units that were sold during the stay. Well, we don't know that for a fact. It's simply an escrow amount. I mean, once this appeal is decided, then the District Judge will make some determination as to the disposition of those funds. There's no doubt about that, Your Honor. But that doesn't mean that any amount in escrow would be within the District Court's discretion. As Chief Justice Roberts wrote in the recently decided eBay case, discretion is not win. It's not anything. And indeed, as the Supreme Court has noted, the Court in these kinds of situations has to bring equity to bear, has to analyze. Yeah, but if you look at page 57 of the appendix, I mean, the order says the ultimate fate of the money paid into this account will depend on subsequent developments in this case, etc., etc. So we don't have a decision about what's going to happen to the money, right? No, no. And that's absolutely correct, Your Honor. But you do have a decision of the Court ordering Microsoft to put $2 a unit in during the course of the stay. And that can be reviewed for abuse of discretion, and there was clearly an abuse of discretion here. He said, the District Judge, he was not bound by the jury verdict in determining the escrow amount. He ignored it. That's got to be an abuse of discretion, particularly after the eBay case. He can't just ignore an enormous fact on the landscape such as that. And moreover, he applied an automatic rule. He said, whatever Mr. Amato wants, Mr. Amato gets. Again, in view of what the Supreme Court did in the eBay case— But that's in terms of the escrow, not necessarily in terms of any subsequent award. Again, that's true. But that can't mean that any number is within his discretion. The patentee in such a situation could ask for anything and effectively take the power of a stay away from the Court. You mentioned the eBay case. Now, Microsoft did not challenge the grant of the injunction, correct? Well, at that time, the eBay case was not decided, Your Honor. What is your view on the impact of the eBay decision on this case? Well, I think—let me answer it this way. If eBay had been decided before that decision, Microsoft would have definitely argued that no injunction should issue for products that were already out there. Now, products that were going to be released in the near future, that's a different situation. I'll note that Microsoft has removed the accused functionality from its most recently released product. But we would have definitely argued, under eBay, no injunction should issue for products that are already out there because, as the District Court found in his stay decision, that such an injunction would create an enormous amount of harm, not only to Microsoft. But you're not arguing that now. Well, eBay was decided after this appeal was started, Your Honor. I'm not challenging that right now, Your Honor. But I may challenge it if it goes back because eBay has new law and really turned the law on its head. And what effect do you think the eBay decision has on this $2 per unit escrow? Well, I think the eBay decision says that a District Court cannot—or, for that matter, a court of appeals, in this kind of context, cannot apply any kind of automatic rule. Equity has to be brought to bear, an analysis of the facts and the balancing of the equities. That did not occur here. The court said, I'm ignoring the jury verdict and I'm giving Amato whatever he wants. That's an automatic rule. But that goes to the injunction. But, I mean, it seems to me once the injunction is issued, the question of what an appropriate escrow amount is not really affected by the eBay. Well, the eBay case was not about escrow. That's true. Of course. But the eBay case was very clear that automatic rules in the equitable context are not the way to go. The court has to balance the equities. And I might point out, as the District Court found, there's no reason for an escrow here at all. This was a $6 million judgment. If Microsoft is not going anywhere, it can satisfy that judgment. I guess you could have said, well, forget about a stay. We'll just take the injunction so we don't have to make the escrow deposit, right? He could have. You could have. You could have said, forget about it. We don't want to stay under those circumstances. We'll just take the injunction. Only at the enormous harm to Microsoft's business and the business of Microsoft's customers that the District Court found. There would be enormous harm for Microsoft to ignore that. That's why it's actually taken the accused functionality out of its products. I'd like to treat the inexecution language, if I may. No, I was going to ask you to do that, Mr. Kolf, because you got some questions on the escrow amount. Why don't you get back to your claim construction argument? I hope. Go ahead and do that now, but I'm going to have a couple of questions on the other claim construction aspects. So don't use up all your time on the inexecution. Of course. Of course. The special master originally interpreted the inexecution claim language to require directing the computer to perform the claim functions. Nobody ever objected to that. The District Court adopted it, and no one's ever appealed it. And there was support in the record, as identified by the special master. That's an appropriate claim interpretation, and that's the proper one. Out of the blue, the District Judge indicated that he was thinking about changing that, and eventually instructed the jury that, well, you don't have to find that anybody ever directed a computer to perform the claim functions in order to find infringement. He never cited any evidence from the intrinsic record. Didn't have any evidence before extrinsic evidence. Never cited any. It's clearly unsupported. That's an error of law. Well, of course, the software really performs no function when it's just sitting in a computer. That's right. So isn't the statement in the claim simply, shall we say, a perhaps slightly awkward way of expressing the functionality of the software, not necessarily expressing a condition of operation? Not at all. First of all, that interpretation of the claim simply reads the language out, and that would make it the same as first means for performing the function, would be the same as first means in execution for performing the function, and I think the precedent of this court requires a presumption that every word has meaning, and there is meaning here. I would note that the portion of the specification that supports this, incited by the special master, specifically says that the power of the invention, the point of the invention, is in its operation, at the bottom of column 23 of the specification. And that's what they claimed. Now, there may have been other reasons at that time. Of course, I think you can make that statement about almost any invention. That's true. But the patentee gets to claim his invention the way he wants to. Mr. Amato could have claimed this as first means for performing function acts, a spreadsheet program for doing that, but he didn't. He put those words in there. The public sees those in the public record. He should be stuck with that. He should be the one who takes the risk of putting extra words. Well, we're stuck with it, but the question is what does it mean? That's right, and the special master interpreted that through the Markman process, and the court adopted it, and no one ever objected or appealed to this very day. So that is what it means. It should be what it means for purposes of this case, directing a computer to perform the claimed functions. And there was no evidence that anybody ever did that. So that alteration. Well, how was the jury instructed on this point? The jury was told that it did not need to find that the claimed functions were actually performed in order to find infringement. So? Which is directly inconsistent with the claim chart. Well, so they could change the claim construction. What's the matter with that? After the claim chart was given to the jury. The claim chart was given to the jury that said you must find that the functions were performed. The jury heard the evidence. Then the court said you don't have to find that anymore. That was clearly an indication to the jury that the judge had made up his mind about that fact. That's the only way it could have been interpreted. But on May 16th of 2005, the judge told you that was his interpretation. The judge says it was a tentative interpretation. And, in fact, I would like to address that point. There's no doubt that Amato thought that was tentative. I would direct your attention to the briefs, the bench briefs filed on this point. Amato filed his bench brief on this point first. If it was a final decision that he won, why was he filing the brief? But the point is you had some notice that this was common. That's right. And then a couple days later, the judge gave the proper interpretations, the original interpretations. We had no reason to object to that claim chart. Those were our interpretations that said directing the computer to perform the claimed function. We only had reason to object to the instruction that came later, and we did. We told the judge when he announced his tentative decision. We told him in the bench brief, and we told him in the argument before he issued that final instruction. Well, let me move you on to a couple of these other claim construction issues. One of the ones, as I understand it, you look at this database file stored in said memory. A limitation here, and you say that requires that it be stored in the memory in a particular hierarchy. That is the record fields data hierarchy, right? That's right. And did you ever ask for that particular claim construction? We didn't need it. It's the plain language of the claim. Okay. So under Hewlett-Packard, unless we find that the plain language of the claim requires that, you lose, right? I think you have to find the plain language that requires that. But it does. It says a database file stored in memory and containing records and fields in the fields containing data. Yeah, but it doesn't on the face of it say how it's stored in the memory. It says database file stored in memory and containing records and fields. Well, I understand your contention. Let me move on to the third one where, you know, in writing these briefs, it really helps to give some context. I think both sides could have done more of that here. There's the in place up limitation. If I understand that correctly, what we have is a situation that in the patented device, in the patented software, what you have is a situation in which the data entry is changed and is replaced by basically a spreadsheet entry. Am I understanding that correctly? Close. The first means corresponding structure requires programming that causes the display of spreadsheet information in place of database information. That's the corresponding structure. Whereas in the accused device, they're displayed together, right? No, in the spreadsheet, in the accused device, it all comes from the spreadsheet. It's only spreadsheet information. That's it. There's one source of data in the accused device. It's the spreadsheet file. In the disclosed system, there's two sources. There's a database file in memory and there's a spreadsheet file, spreadsheet storage. So the point is that in the accused device, the displayed information comes from the spreadsheet memory rather than from the database memory. The point is that because in the accused device, it comes from one source, it cannot be said to display data from one source in place of data from a second source. I want to be sure that I understand this correctly. You're saying that in the patented device, the spreadsheet data replaces the database information, the record information, in the display, right? That's right. But in the Microsoft device, you can have both of them at the same time. No. In the Microsoft device, it's only spreadsheet information. It's always spreadsheet information. Always. Okay, I understand. That's it. And, Your Honor, I'm into my rebuttal time. Well, you've used up almost all of your rebuttal, Mr. McCall, but you've had a number of questions from the panel. So we will restore your full four minutes of your rebuttal. Thank you. Thank you very much. And we'll hear from Amato now. Mr. Belusco? Belusco, Your Honor. Belusco. See, I got that one wrong. And if you, you know, if necessary, we'll give you the same amount of time that Mr. McAuliffe will have. Okay, thank you. Thank you. And I see you've, before you start, I see you've got one minute for rebuttal, I guess, in connection with your cross appeal, correct?  Just bear in mind, if you choose, which you may or may, it's up to you, obviously, if you choose just to focus on your response to the appeal, you can use all your time for that, but you won't get a, you know, you won't get a rebuttal because he won't be coming back at you. So, but anyway, use it as you wish. Very good, Your Honor. It pleads the Court to start with the inexecution. Inexecution here is a term used in connection with an apparatus claim. This is clearly an apparatus claim. It says an apparatus for. And the spec backs that up, both in terms of the background of the invention, talks about it being software. Software. Well, how does one define software? The only way to define it is in terms of identifying the functions that are performed when it is in execution. That's the only way to do it. Isn't Mr. McAuliffe right when he says that the district court's construction reads out of the claim the words inexecution? No. Because the claim reads, I mean, the functional statement is still there associated with the program. What's? Yes, Your Honor. Let me explain that. What's missing? When we're talking about these functions of software, they are necessarily being described when they're in execution. What did the court really do in terms of construction? You're saying that what it means is this is the way it would function when it's executed. That's correct. And if you think about it, every software claim is like that. Every claim that software that's defining those functions, you implicitly read in, in execution it does these things. But doesn't that lead to the conclusion that the words in execution in the claim have to add something, have to mean something more than what is implicit in any recitation of a functional statement? No, because this is actually, as you pointed out, it may be somewhat cumbersome in the length, but it's really describing more accurately exactly how these are always being looked at. These functions are meaningless except when it's in execution. And because this is an apparatus claim, we are looking at the structure. And the structure here is defined in terms of, of course, these functional recitations. But that structure exists, as you pointed out, whether it's running or not, it's there. These programs, that software is there. So you're arguing that basically the intrinsic record makes it perfectly clear that when the claim talks about in execution, it's simply reciting the functional attributes of the software consistent with the entire written description and there's nothing particularly special, unique, inventive about what happens when it's operating compared with what happens when it's sitting in the computer ready to operate. That's correct, Your Honor. And if you think about it, like I say, the structure's the same. Whether it's in operation or not, it's there. It doesn't have to be modified. There's no code that needs to be modified, fulfilling fantasy sports requirement. And whether it's active or not, it's all there. I want to step back, though, to respond to that somehow there was some prejudice here. Because I don't think there was. The only person that thought that there could ever have been any difference in this construction is Microsoft. When you step back and look at what they wanted to interpret, they asked for about 100 terms to be interpreted in this pattern. And we had a special master for that purpose. They never asked for in execution standing alone. As a matter of fact, they asked for in execution only two times that it appeared. And both of those were in the means elements. For example, there's the spreadsheet program. There's in execution there. No request for interpretation there whatsoever. What they were doing is looking at the means, wanting to interpret that functional language. And if you will look at what they really put in there in terms of their definitions, they were again looking at what that would do when it was in execution. And dragging in, in effect, their hope to drag in a bunch of code. Very specific code that they wanted in the structure of those means. So this is all part of their effort to interpret those means plus function elements. Now, they never raised this machine in execution argument until their contentions of fact and law. Long after the claim construction. And they never raised it in the context of the spreadsheet program until we were at trial. Now, of course, we brought this up. The court disposed of it. And the best record in terms of the court's disposal is to think, what did the judge say very specifically about this inconsistency argument? The judge pointed out he didn't change anything. It was consistent with what he always intended, what we always thought, that this was nothing more than discussion of the function in means plus function. So it's clear that these aren't structural limitations. They want to apply some new rule to an apparatus claim. But this court's pointed out, you know, an apparatus is what it is, not what it does. And here, in execution, is nothing more than the recognition that to understand the function of these software programs, that they must be considered when they're in execution. Let me move you on to another question. Yes, Your Honor. And that's the disposition of the escrow account. Okay. Do you agree that the district court has not yet decided what the disposition of the escrow account should be? You know, that's an interesting question, because I don't know that I agree with that. But I would step back and say this. Whether it has or not, it did not abuse its discretion. Well, but that makes a big difference. I understand. If we're reviewing an order that says you're going to be paid $2 a unit, it's a different order than we'll put $2 a unit into an escrow account and decide what to do about it later. Okay. Well, let me step back and say why. If it is $2 a unit, and that's what we're to get, it's not an abuse of discretion, and that's where this needs to be decided. Well, which is it? I think that it's that, Your Honor. Well, where does he say that? Well, yes. That language I read to you from the order says that the disposition will await later developments. Well, I think that's more a reference to also his comment, maybe this case is going to be settled, maybe it's going to go away. But I certainly understood that he was giving $2 per unit for units that they wanted to use. And let me step back. Isn't the normal disposition of an escrow is that it's subject to later events, and then those funds are, in effect, reserved for disposition as appropriate depending on the circumstances? I believe that is correct, and I think the circumstances that would make that appropriate may be the determination that liability indeed exists here. Well, I would agree with you, but I think that's a separate question then from whether the district court made a determination that that is going to be the sort of post-judgment royalty that will be applied no matter what. Well, we viewed it as that, but to... I certainly can understand why you'd want to do that. I'm not sure that's the case. But I'm just pointing out that in terms of the abuse of discretion, and I think it should be considered that issue, Your Honor, that nevertheless the court was well within its discretion, and why? Well, because we aren't talking about a damage issue here. That ended the day the jury verdict came in. Damages are for the past and injunctions for the future. And to get to your question about eBay, we moved on the four-factor test that the Supreme Court in Merck Exchange said was the appropriate test. The Court's order went through those four factors. So in terms of determining an injunction, it went about it right. But the Court applied the presumption on the irreparable harm that the Supreme Court has said is no longer an appropriate test. Well, but again, I think they went through the test correctly, and moreover, that issue isn't on appeal. But what I'm getting to is we got to the stay then, and we had four factors there. The Court went through them, and first and foremost, it determined that there wasn't a strong showing of likelihood of success on appeal, which is, I think in jurisprudence, the most important of the factors to look at. But it did fine in weighing the other three. But the Court would have been well within its discretion to simply deny any stay here. So how can a denial, well within your discretion to deny a stay, somehow be okay, but something less, granting the stay that Microsoft asked, but asking to put aside money at a certain amount, be somehow an abuse of discretion, particularly where, as here, they said they had a designer. They said that throughout the trial. They said they didn't need it. So they always had it. That's why we keep asking questions about whether he's determined that you're going to get the money or whether he's just put it into an escrow account. I mean, it could be an abuse of discretion if he said the post-judgment rate should be $2. I don't think it is because I don't think that it's tied to the damage period. And it shouldn't be tied to the damage period because it's not an assessment of a willing licensor, willing licensee whatsoever. It's now within the discretion of the Court for giving terms and conditions for a stay, and we aren't dealing with a hypothetical negotiation occurring years ago. We're now dealing with a whole new animal that occurs as of that time. Mr. Belosco, how do you address Mr. McAuliffe's argument with respect to the in place of language? Well, Your Honor, first off, there's testimony in the record about this from Dr. Taylor. Is your primary contention here that this can be justified under the doctrine of equivalence as opposed to literal infringement? No, it's under literal, too. Okay, why is it literal? I think it's the same question that Judge Lynn was asking. Right. I don't think we have to get to that level. They're adding a reading to the claim construction that isn't there. What we have are data structures, Your Honor. And what we have for the link table, the database, it's going to be something that is a data structure that's, and as you've already pointed out, there's nothing in the claim that says it has to be in memory location here. No, but I think you're addressing a different question than the one that Judge Lynn and I were asking about. If you look at the claim construction that was given to the jury on page 76 of the appendix, Yes, Your Honor. it talks about causing the display of the call prog range in place of the active record. Right. So I think what we're asking you is how was that satisfied literally based on the description that opposing counsel has given us as to what happens in the accused device? Your Honor, it is done in the active record. It is done very specifically in the manner that Dr. Taylor suggested. And you're going from one data structure, which is on the access side, and you're getting something from the other data structure, the spreadsheet side, and there is a replacement being made in that active record from one data structure. Well, what is call prong range? Is that the spreadsheet information? Yes, and we're substituting something then from the database for that. So what they're suggesting is that this instruction requires that the spreadsheet data replace the database information in the display. And as I understand, the accused device, that doesn't happen in the accused device. Well, actually, it does, and even their expert conceded that. If I may address you to appendix page 12980, 5 to 23. What volume? 5? 12980. Volume 5. And that is going to be volume 5, I believe. Volume 5. Okay, and if you go to lines 5 through 23 there, that's where their expert recognized that it was replaced and conceded it. And also, I'll note, Well, I don't see, I mean, the problem here, and we've mentioned this in several opinions, you get these sort of very confusing bits of testimony by experts which really don't address directly the claim language. And I'm just skimming this quickly, but where does he say, where is he addressing the claim interpretation that the district court gave on this point and saying that it satisfies that and then explaining how it satisfies that? Well, he's pointing out that it's going to the access link table. Now, the result of that recalculation, they're part of the same record, the results are going to appear in the access link table, is that correct? Eventually, yes. So the results from the recalculation in Excel have been loaded into the access link table, is that correct? Yes. How am I supposed to understand that? Well, Your Honor, let me then give you the, I gave the more basic question. If you refer to the same volume, 12.796, 22 through 12.7973, I asked the basic question. Now, assuming that the function of displaying the call prog range in place of the active record was required by the claims, would this change your conclusion that the access in Excel would infringe literally under the doctrine of equivalency? No, that wouldn't change my analysis. If that was required, it would infringe both literally and under the doctrine of equivalence. So I directly dealt with that with Dr. Taylor. So there's certainly evidence in record to support what the jury determined here, consistent with the construction and the jury instruction that you referenced, Your Honor. And the last thing, do I get a few more minutes? I'm not sure where I am. Well, I'm going to give you an additional five minutes. So you have about three and a half more minutes. Thank you, Your Honor. That should make it equal with what Mr. McAuliffe has. That way you'll both end up with 20 minutes. Okay. Lump sum here. This idea that they could argue a lump sum as a damage issue is inappropriate. What case says they can't argue a lump sum? Well, Your Honor, there's no case that says that you can. There's no case that deals with the issue head on in this context. It is an issue of first impression, and therefore it's reviewed, I think, as an issue of law. And why we say that's inappropriate is for a couple of reasons. First off, of course, the election of remedies is something for the plaintiff to choose. You can choose to go only for an injunction. You can choose past damages, future injunction. A lump sum by its very nature starts to crowd out the injunction because lump sums typically run for the life of the patent. So there you have a defendant already crowding into the injunction period, and that's inappropriate. That's not an election of remedy a defendant gets to make. Here they try to contort that and say, oh, okay, you can go ahead and we're just going to do a lump sum for the period of damages in front of the jury. So somehow we're to believe that we have a hypothetical for a certain time period, which you can't possibly know at the time of the hypothetical. It's not like for the life of the patent. Now it's for some arbitrary amount of time until the damages are decided by the jury. It didn't even go into the accounting period. And that lump sum was divorced in any way from looking at the use made of the invention by the infringer. Now, at a minimum, at a minimum, it should have required that it be based on projected sales, but it wasn't. And in this court's recent case of applied medical, of course, the court looked at the issue of, you've got to look at this in the context of the infringement being redressed. Here it was just a number thrown out. Oh, that's what they would have done for some arbitrary period of time. Is it not true that in the real world people sometimes bargain for lump sum royalties? In the real world it's true that they bargain for them. In the real world it's usually true that they also look at the expected sales over a time period in order to get there. In the real world, you don't have Section 284, which says that you can have no less than a reasonable royalty for the use made of, for the infringement of the, or the use made of the invention by the infringer. Do the jury instructions, did the jury instructions obligate the jury to find a lump sum amount? They weren't obligated. This was permitted to be argued, and then you combine that with this equity valuation that had nothing to do with the patent, that was long past the hypothetical date, that a compounding prejudicial effect on benchmarking a lump sum here. And that influences accounting for the same reason. We've got a number. How can a court, without any instructions or any special derogatories, go out and say, oh, it must have been this number? When I've got one lawyer arguing it's a lump sum, got another lawyer arguing it's running royalty, and now magically the trial judge can divine it. Well, they discern a reasonable royalty of this amount because I'm figuring it out on this basis. Can't do that. At a minimum, that accounting has to go back. Thank you, Mr. Fulisco. Thank you. Mr. McAuliffe? Thank you. If I may, I would like to start again on the first means. The jury found the first means was met only by equivalence, 112-6 equivalence and doctrinal equivalence, both, but only by equivalence. I thought they found both literal and doctrinal equivalence. Literal in that the structure was there only by equivalence. Oh, I see what you mean. Okay. Now, Mr. Belusco just misspoke. He indicated that there was evidence to find two data structures. That is incorrect. In fact, his expert agreed that all the data came from a single data structure, the spreadsheet file, and his expert insisted on calling it the shared data structure. In the accused device, all the data in the link table comes from a spreadsheet data structure. That is why there cannot be this display of spreadsheet information in place of database information. The part of the transcript he just cited you to was simply a description of how the spreadsheet information gets updated. That is, new spreadsheet information displayed in place of old spreadsheet information. This coordinated display, this in place of display in the patent specification was what the inventor said over and over again, distinguished his invention from every prior art reference. In fact, he did not only say it. He went through every reference he knew about from the prior art and explained how it distinguished his invention. In a footnote in our opening brief, we cited each instance of it with a blurb, with a quote. I wanted to put that footnote in our reply brief, but the court's word limitations on their briefing wouldn't let me. That's how much verbiage. That's how much verbiage he uses. So there is clearly a specification disclaimer here, and the district judge was wrong, committed an abuse of discretion in not instructing the jury on it, and the abuse of discretion was based on an error of law. It's very clear he bought the argument that specification disclaimer doesn't have anything to do with equivalence. That is an absurd argument. It's wrong as a matter of law. He should have instructed the jury on specification disclaimer, and if he had, given the evidence that eventually went in, there's no doubt that this verdict would have been non-infringement down the line. Now, if I can move to the second means, because I think it's an important issue. The second means claim element claims a two-command approach, entry of a select command to select a database record, entry of a recalculation command to shoot the database record over to the spreadsheet and cause a recalculation. The only embodiment described in the patent specification requires only and describes only a one-command approach, whereby any record pointed to by the cursor at the time the recalculation command is given is shot over into the spreadsheet for the recalculation. There is, therefore, no structure whatsoever described in the patent specification for performing the function as claimed. Under default proof credit cards, in Ray Donaldson, in Ray Dossal, the Atmel case, a number of others, that requires a finding of invalidity for indefiniteness under Section 112, Paragraph 2. If I may just jump back to the database file element, Your Honors, I would like to point out that what they've accused is a picture on the computer screen to meet that, to meet claim language that says database file stored in memory and containing records and fields. It's clearly a substantially different, it's clearly different, first of all, but it's also substantially different. And moreover, any finding of equivalence on that point would vitiate the distinction the claim draws between spreadsheet data structures and the database file and would also vitiate the claimed interaction between those two as we described in our brief. Thank you, Mr. McCall. Thank you very much. The case is submitted.